## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MIRANDA ARISON, MALCOLM DYER, DANTE RIPLEY, and CHARLES SMITH JR.**, on behalf of themselves and all others similarly situated, | : : : : | **Case No.** |
| **Plaintiffs,** | : : | |
| v. | : : | |
| **FAYETTE COUNTY, PENNSYLVANIA; JEREMY MYERS, Warden of Fayette County Prison; JAMES CUSTER; ANGELA ZIMMERLINK; DAVE LOHR; VINCE VICITES; RICH BOWER; SCOTT ABRAHAM; and STEVE LESKINEN**, in their official capacities as members of the **Fayette County Prison Board,** | : : : : : : : : : | |
| **Defendants.** | : | |

## CLASS ACTION COMPLAINT

Plaintiffs Miranda Arison, Malcolm Dyer, Dante Ripley, and Charles Smith Jr. (collectively, Plaintiffs), by their undersigned counsel, bring the present Class Action Complaint for equitable relief on behalf of themselves and all others similarly situated.

### Nature of Action

Plaintiffs—individuals currently incarcerated at the Fayette County Prison ("FCP")—seek relief from cruel and inhumane conditions at FCP. The numerous systemic and ongoing problems with FCP's sanitation, plumbing, sewage and ventilation systems have exposed Plaintiffs—and all other prisoners—to serious health and safety risks. Sewage is routinely discharged into Plaintiffs' cells, where they sleep and eat. Because Plaintiffs are often "locked in" to their cells for seventeen to eighteen hours a day, they cannot escape the refuse. Water leaks have caused extensive damage to light fixtures, walls, ceilings, floors, and other areas, creating safety hazards. Medical supplies

1

must be kept behind a thin wooden wall in an attempt to protect against the constantly leaking pipes. Because of the leaks, mold accumulates in the limited shower areas and in Plaintiffs' cells. Beyond the mold, the showers are often unusable because of water and sewage backups.

Pests are a ubiquitous problem: cockroaches, mice, and rats are found throughout the facility, including in the kitchen. FCP's ventilation, heating, and cooling systems are woefully inadequate, and expose Plaintiffs to extreme temperatures in the summer and winter. Indeed, one only needs to enter through the Prison doorway to experience the foul smells of feces and stale air. The heat of summer is exacerbated by the lack of ventilation, causing prisoners to protest for ice water. Due to ongoing problems with FCP's sewage system, Plaintiffs are frequently without access to running water for drinking, showering, and flushing toilets.

FCP is comprised of two buildings, the original Prison—which is nearly 130 years old— and a dormitory-style building called "the Annex" built in 2002. The original Prison has significant infrastructure problems, with stress fractures and sinkholes compromising its structural integrity, and corroded wiring, asbestos, and lead paint posing serious health and safety risks.

Each of these problems is compounded by frequent overcrowding. Although FCP has an official capacity of 264 beds, the prisoner population routinely exceeds that number, forcing many prisoners to sleep in makeshift plastic cots (called "boats") on the floor of common areas, where sewage water has accumulated and pests congregate. The overcrowding prevents prisoners from any meaningful exercise. Combined with the lack of water and sanitation, these conditions create hostilities—fighting and protest are common.

Each of these conditions places prisoners at a substantial risk of serious harm. Taken together, these conditions create an environment so toxic that they threaten the physical and mental health of all prisoners exposed to them. It is of no surprise that prisoners routinely describe other

2

prisons where they have been housed as "heaven" and observe that they are treated worse than animals.

Defendants Fayette County, the members of the Prison Board, and Warden Myers have the responsibility to provide safe and humane conditions for the prisoners in their charge. Defendants have abdicated this responsibility, and have acted with deliberate indifference to Plaintiffs' health and safety by exposing them to barbaric conditions that violate their basic human rights. Defendants have also failed to provide Plaintiffs with a space in which they can have confidential communications with their lawyers, in violation of their First and Fourteenth Amendment rights, and have provided benefits to male inmate workers, including higher pay, that they do not provide to female inmate workers.   Plaintiffs have commenced the present class action seeking an injunction to compel Defendants to eliminate the unconstitutional customs, policies, practices, and conditions challenged in this lawsuit.

## Jurisdiction and Venue

1.     This action is brought pursuant to 42 U.S.C. § 1983 and the First, Eighth, and Fourteenth Amendments to the United States Constitution, seeking declaratory and injunctive relief.

2.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)–(4).

3.     This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to this action occurred in Fayette County, Pennsylvania, within the Western District of Pennsylvania.

## Parties

4.     Plaintiff Miranda Arison has been incarcerated at the FCP as a pretrial detainee since February 2018.  She is confined in a cell in the original Prison building on the women's floor.

She has been housed in an environment that, in addition to other substantial problems, frequently lacks running water; has serious insect infestations, vermin, poor ventilation, poor sanitation, and exposed electrical wiring; and is subject to extreme cold and hot temperatures.  During her incarceration, Ms. Arison has had very limited access to outdoor exercise time.  Like the other representative plaintiffs and the prisoners she seeks to represent, she is required to clean her cell but has not been provided with necessary cleaning supplies.  Ms. Arison is an off-range inmate worker at FCP, meaning that she is authorized to work in housing blocks other than her own.

5.     Plaintiff Malcolm Dyer has been incarcerated at FCP since November 2017.  He is a post-trial detainee awaiting transfer to a state correctional institution.  He is confined in a cell in the original Prison building.  He has been housed in an environment that, in addition to other substantial problems, frequently lacks running water and working lights; has serious insect infestations, poor ventilation, poor sanitation, exposed electrical wiring, water leaking from the ceiling, and a toilet that frequently overflows; and is subject to extreme cold and hot temperatures.  Mr. Dyer has also been housed in the Special Management Unit (SMU), where he was subject to freezing cold temperatures, human feces, pools of water on the floor, no working light in his cell, and a lack of running water, cleaning supplies, and hygiene products. During his incarceration, Mr. Dyer has had very limited access to outdoor exercise time.  Like the other representative plaintiffs and the prisoners he seeks to represent, Mr. Dyer is required to clean his cell but has not been provided with necessary cleaning supplies.

6.     Plaintiff Dante Ripley has been incarcerated at the FCP as a pretrial detainee since January 2018.  He is confined in in the original Prison building where he is currently assigned to sleep on a cot on the floor in a common area.  He has been housed in an environment that, in addition to other substantial problems, frequently lacks running water; has serious insect

4

infestations, poor ventilation, poor sanitation, and exposed electrical wiring; and is subject to extreme cold and hot temperatures.  During his incarceration, Mr. Ripley has had very limited access to outdoor exercise time.  Like the other representative plaintiffs and the prisoners he seeks to represent, Mr. Ripley is required to clean his cell but has not been provided with necessary cleaning supplies.

7.     Plaintiff Charles Smith Jr. has been incarcerated at the FCP since January 2018.  He is a post-trial detainee awaiting transfer to a state correctional institution.  He is confined in the Annex building.  He has been housed in an environment that, in addition to other substantial problems, has an insufficient number of urinals and toilets, problems with the sewage system, serious pest infestations, and is exposed to extreme hot and cold temperatures.  During his incarceration, Mr. Smith has had very limited access to outdoor exercise time.

8.     Defendant Fayette County is a municipal corporation and a political subdivision in and of the Commonwealth of Pennsylvania with authority over the operations of the FCP.  The County has the authority as well as the obligation to fund the facility in a manner that protects the constitutional rights of the prisoners who are confined in it and to finance whatever physical renovations, programs, and activities are necessary to remedy the unconstitutional conditions and practices that now blight the institution.

9.     Defendants James Custer (Fayette County Sheriff), Angela M. Zimmerlink (Fayette County Commissioner), Dave Lohr (Fayette County Commissioner), Vince Vicites (Fayette County Commissioner), Rich Bower (Fayette County District Attorney), Scott Abraham (Fayette County Controller), and Steve Leskinen (Fayette County Court of Common Pleas Judge) are the members of the Fayette County Prison Board, a body created by state law to oversee the FCP.  As

members of the Board, they are responsible for monitoring conditions and practices in the institution as well as establishing policies for its operation.

10.     Defendant Jeffrey Myers is the warden of the FCP.  As the on-site day-to-day administrator of FCP, Warden Meyers has the authority as well as the obligation to propose, establish, and implement policies and practices to operate the facility in accordance with the dictates of the United States Constitution.

11.     The Defendants, who are sued solely in their official capacities, have acted under color of state law within the meaning of Section 1983 while engaging in the acts and omissions catalogued in this complaint.

## Statement of Facts

12.     The FCP is a correctional facility located in Uniontown, Pennsylvania, which houses individuals both pre-trial and post-conviction.

13.     Defendant Fayette County is responsible for the operation and management of the Prison.

14.     The FCP is comprised of two buildings:  the original building ("Prison"), which was built in 1889, and an annex ("Annex"), which was built in 2002.

15.     The Prison was built with a capacity for 80 prisoners.

16.     The capacity was increased to 160 prisoners by "double celling," or housing two prisoners in each cell.

17.     Each cell in the Prison is approximately 6 feet long by 8 feet wide.

18.     The Prison has six "ranges"—two on each floor—and each range contains eleven cells with two prisoners per cell.  There is one shower on each range.

6

19.     The Annex is a separate building that can hold 80 prisoners with dormitory-style beds.

20.     Prisoners qualify to be housed in the Annex if they are classified as minimum security and have a bond of $50,000 or less.

21.     Combined, the Annex and the Prison have an authorized bed capacity of 264 prisoners.

22.     Beyond the stated capacity, FCP officials have publicly stated that the population should not exceed 230 because a higher capacity puts prisoners at significant risk to their safety and security.

23.     Despite these concerns for prisoners' safety and security, the FCP frequently houses significantly more than 230 prisoners.

24.     From January 2016 through December 2017, the FCP exceeded 230 prisoners in 17 of 21 months of available data.

25.     Although the percentage routinely changes, approximately 75% of prisoners are pre-trial, while 25% are serving short sentences.

26.     Male prisoners who are sentenced to terms of more than two years are transferred to state corrections institutions. Female prisoners sentenced to any term of imprisonment are typically transferred to state corrections institutions.

27.     Due to the persistent structural and environmental hazards present in the FCP—and severe overcrowding—any prisoner who can be moved to a state correctional institution is transferred as soon as possible.

999998.02831/109922942v.1

28.    As discussed below, conditions at the FCP have deteriorated to such a degree as to expose Plaintiffs to an unreasonable risk of serious harm to their health and safety in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

### Plaintiffs Are Routinely Exposed to Raw Sewage and Other Problems Caused by Antiquated Plumbing

29.    The Prison's antiquated sewage system is woefully unsuited to handle the needs of the facility's prisoner population. The Prison relies on one four-inch pipe to dispose of the entirety of the Prison's sewage output.

30.    Pipes are frequently overburdened and routinely leak raw sewage directly onto Plaintiffs, all other prisoners, and the Prison's staff. The leaks cause sewage to accumulate on the floor and other surfaces throughout the cells and common areas, causing persistent foul odors and attracting sewer gnats.

31.    Most cells have a combined toilet and sink. The toilets in the cells are often unusable due to disrepair, blockages and/or other malfunctions. Toilets frequently overflow as a result of blockages, forcing prisoners to keep cups in the toilets in an effort to slow the flooding process. Despite the efforts taken by Plaintiffs and all other prisoners, toilet water still accumulates in the cells where the prisoners sleep and eat.

32.    The clogged toilets also lead to extended periods of time in which running water is denied to Plaintiffs and all other prisoners.

33.    For weeks last year, prisoners were required to share toilets that were not connected to running water because of the collapse of the antiquated sewer main.

34.    In order to remedy the lack of an operating sewer system, Defendant Fayette County dug a large hole behind the prison, 15 to 20 feet deep, where raw sewage would be released directly into the ground.

8

35.    During this period, water to the prisoners' cells was cut off.  As a result, prisoners had to wait until corrections officers turned on the water in order to flush the toilets in their cells. These "controlled flushes" occurred no more than twice per day.

36.    Without the ability to flush, toilets overflowed, which flooded cells and common areas with raw human waste.  Prisoners were routinely in cells with the overflowing toilets, often for 23 to 24 hours a day, even while eating.

37.    During this period, prisoners were denied access to other toilets, and told to urinate in garbage bags.

38.    During this period, prisoners could not wash their hands, brush their teeth, or shower for days at a time.

39.    During this period, prisoners were denied adequate drinking water.

40.    During this period, a layer of raw sewage over an inch deep was on the floor of the basement, where prisoners are housed and work, and where the Prison's medical facility is situated.

41.    Although the sewer line was repaired in late October 2017, these conditions continue to routinely arise due to the antiquated sewer system, and Defendants' failure to maintain it.

42.    Ms. Arison is a prime example of the ongoing inhuman conditions at the Prison. She has been incarcerated at the Prison since February 2018.

43.    During her time at the Prison, the water in Ms. Arison's cell has been shut off nearly every day. This not only leaves her without any water to drink, but also deprives her of the ability to flush her toilet.

44.    As a result, Ms. Arison is sometimes forced to be in her cell for hours in the presence of feces.

45.    On one occasion, Ms. Arison did not have access to water in her cell for nine consecutive days.

46.    Mr. Ripley and Mr. Dyer have also been repeatedly deprived of access to water in their respective cells, and have been housed in cells with toilets overflowing with feces due to a lack of running water.

47.    Problems with plumbing are prevalent in other areas of the Prison as well. Showers are in extremely poor condition, and mold frequently grows on bathroom walls as a result of the inadequate ventilation. Showers are also routinely denied to prisoners due to sewage and water backups.

48.    Ms. Arison, for example, has been exposed to mold near the toilet in her cell and in the showers near her range, and has not been provided sufficient cleaning supplies to remove the mold.

49.    Likewise, mold is also prevalent throughout Mr. Ripley's block despite prisoners' best efforts to clean the molded surfaces.

50.    Showers often suffer from extremely low water pressure, and routinely only provide cold water.

51.    Additionally, due to the constant sewer issues, laundry service is often significantly backlogged. As a result, prisoners are often denied clean towels, sheets, and clothes for weeks at a time.  Many prisoners wash their clothing in the sinks in their cells because they are afraid that their clothes will not be washed properly or stolen.

52.    Pervasive water leaks have caused extensive damage to light fixtures, walls, ceilings, floors, and other areas. The leaking increases when it rains, yet electrical wiring remains exposed throughout the Prison. Leaks have been reported above power distribution boxes, creating

an obvious risk of electrocution.

53.    Buckets have been used to catch water dripping from the plumbing in the ceiling near the Prison's medical facility, posing safety and health risks to Plaintiffs and all other prisoners.

54.    Due, at least in part, to the pooling waste and inadequate plumbing, prisoners have become ill—severe headaches, diarrhea, constipation, and pain brought about from refusing to use an already overflowing toilet are not uncommon.

55.    Even though the health effects stemming from the crumbling sewer and sanitation systems are well-known, Defendants have failed to provide necessary cleaning supplies to prisoners, even after ongoing and daily requests for them.

56.    For example, Mr. Ripley's entire block flooded with toilet water for more than half an hour, and he and other prisoners were afterwards forced to clean the area with inadequate supplies—just mops and buckets.  The inability to clean resulted in standing sewage throughout Mr. Ripley's and the other prisoners' cells and the common area where other individuals sleep on plastic cots on the floor.

57.    Prisoners must often use the same dirty mopheads over and over—even when the mops have been used to clean raw sewage.

58.    Prisoners are also frequently deprived of hot water.  For example, Plaintiffs and all other prisoners recently had no hot water for three days over Memorial Day weekend.

*March 27, 2018, Incident and the Special Management Unit*

59.    On March 27, 2018, Mr. Ripley and other prisoners refused to return to their cells to protest the fact that they had not had any water in their cells for several days.

60.    Mr. Dyer joined in the protest but did not have a cell to return to as he was being housed in the common area on a cot (called a "boat") on the floor.

999998.02831/109922942v.1

61.     Instead of providing access to water, Prison staff sprayed the men with pepper spray, prohibited them from showering for 24 hours, denying them an opportunity to decontaminate from the pepper spray, and took away their access to the commissary.

62.     After the incident, Mr. Dyer, along with other prisoners, was sent to the Special Management Unit (SMU) in the basement for thirty days.

63.     The SMU is also in disrepair: It was so cold that Mr. Dyer could see his breath. The cell was filthy and foul-smelling—a prior prisoner, who was placed in the SMU at least in part because of his deteriorating mental health, had thrown feces over the cell walls, and the prisoners were not provided with cleaning supplies for more than a week. Like many of the cells, there is significant leaking along the walls of the SMU, which pools on the floor of the isolation cell.

64.     For days after he arrived in the SMU, Mr. Dyer did not have access to running water or any hygiene products.

### *The Annex*

65.     The Annex is a large metal building resembling a small airplane hangar that is located within walking distance of the Prison.

66.     Although the Annex was built in 2002 with air conditioning, the air conditioning system is frequently broken and not repaired for weeks or months.  On a recent day, the temperature in the Annex reached 100 degrees Fahrenheit.

67.     There are no windows in the Annex and the only cooling available comes from two box fans.

68.     The Annex contains only one urinal and currently only three out of the four toilets are working.

69.     The Annex has four showers.  There is mold in the showers, and pests, including

999998.02831/109922942v.1

leeches and sewer gnats, are a frequent problem.

70.     Frequent leaks in the wall near the showers generate a pool of water on the floor in an area where prisoners routinely walk, creating a safety hazard causing prisoners to fall and suffer injury.

### *Insufficient Heating, Cooling, and Ventilation*

71.     The Prison's heating and ventilation systems are so insufficient as to be virtually nonexistent.

72.     As soon as anyone enters the Prison, it is clear that there is little ventilation throughout the Prison. The air is stale and smells of standing water and feces.

73.     Prisoners are subject to extreme fluctuations in temperature.

74.     The Prison's heating system is controlled from the courthouse adjacent to the Prison.

75.     Court personnel regularly turn the heat off when closing the courthouse for the weekend, leaving the Prison without any heat until Sunday.  The lack of heat is exacerbated by the absence of insulation.

76.      Temperatures within the facility have dropped so low during the winter that Plaintiffs and other prisoners can see their breath while in their cells.

77.     Specifically, in February it was so cold that Ms. Arison could see her breath for days at a time.

78.     Mr. Ripley has likewise experienced dramatic shifts in temperature during his incarceration.

79.     Although the sub-freezing temperatures are well known to Prison officials, the provision of blankets to keep warm is inadequate. Prisoners are issued one sheet, one blanket, and

one mattress. The blankets are thin and often ripped and are insufficient to make the cold temperatures tolerable for prisoners.

80.    As a result of the poor ventilation, the Prison is stifling even when temperatures are relatively pleasant outside. During the peak temperatures of summer, the ambient temperature of the Prison can reach 100 degrees.

81.    The Prison does not have air conditioning in any of the areas where cells are located.

82.    The only cooling system implemented during the summer months is the temporary installation of two or three fans per range. The fans do little to mitigate the summer temperatures, especially because the windows in many of the ranges do not open, and the Prison lacks any other adequate ventilation system.

83.    Defendants are either unwilling or unable to provide ice water to prisoners.

### *Pest Infestations*

84.    Numerous instances of pest infestations have been documented at the Prison: cockroaches, rats, mice, and spiders have been sighted throughout the Prison—including food preparation areas, where rat feces have also been found.

85.    Roaches, in particular, are ubiquitous. The infestation is so significant and unwieldy that even the cleanest cells have roaches climbing the walls, and prisoners sleeping on the plastic cots in the common areas regularly find roaches on their cots.

86.    Worms and grubs are routinely found in showers, and leeches enter the Prison and Annex through sinks. Sewer gnats swarm in the humid and flooded showers.

87.    Efforts to block holes in the Prison walls using steel wool where rats enter have been unsuccessful, as the rats simply chew through the blockages.

999998.02831/109922942v.1

88.     Ms. Arison has frequently seen rats eating in the kitchen, and often hears them in the ceiling. She also sees cockroaches scattered throughout the Prison, including in her cell, on a daily basis.

89.     Mr. Ripley and Mr. Dyer also see pests routinely throughout the Prison.

90.     Mr. Smith regularly sees pests in the Annex showers.

91.     Compounding the exposure to persistent pests is the lack of cleaning supplies provided to the prisoners. Because prisoners have no means to adequately clean their cells, any attempt to kill or otherwise dispose of pests is futile; pests re-emerge day after day without any repellant.

### *Unsafe and Deficient Nutrition*

92.     The severe lack of water, sanitation, pest control, and kitchen facilities has significant negative impact on the nutrition received by all prisoners, including the Plaintiffs.

93.     There are near-universal reports from prisoners that they are underfed and malnourished. Prisoners complain that they are always hungry, and that the provision of nutritious foods, including protein and vegetables, is uncommon. A vegetable "portion" may consist of two pieces of wilted lettuce.

94.     Indeed, one prisoner notes that he lost fifteen to twenty pounds over a three-month period of incarceration in the Prison.

95.     Food preparation and delivery areas are unsanitary. The walls and ceiling in the food preparation area are cracked and crumbling, allowing debris to drop into food. One prisoner described the trays as smelling like feces.  Due in part to the leaking pipes and inadequate sanitation, the kitchen and food trays are dirty, putting prisoners at risk for food-borne illnesses.

999998.02831/109922942v.1

96.     Indeed, as noted above, roaches, rats, and mice are seen running across the kitchen floor where meals are prepared, putting Plaintiffs, and all other prisoners, at risk of serious illness.

97.     Routinely, two meals per day are eaten in the cell. This is true even when the toilets are flooding over with human feces. Because there is only one chair per cell, one prisoner must stand, sit on the flooding toilet, or eat on the bed.

### *Inadequate Medical Facilities*

98.     The Prison's medical care facility suffers from multiple unsafe and unsanitary conditions.

99.     As explained in a recent Prison Needs Assessment conducted for the Prison, "[t]he space allocated for the Health Services is not adequate to properly service the prisoner population. The administrative workspace, exam table, and specimen collection area are co□located in a confined space. There are no proper areas to triage prisoner issues on the housing ranges, so prisoners must be brought to Health Services to be seen. There is no proper area for the administration of methadone, which is a liability concern." Prison Needs Assessment at 3-2, a copy of which is attached as **Exhibit A**.

100.    Moreover, proper refrigeration for medical supplies is lacking, causing some staff members to use ice buckets as makeshift refrigerators.

101.    Supplies, which should be kept sterile, instead sit behind only a thin wooden wall in an attempt to protect the supplies from leaking water and sewage.

102.    During her visits to the medical unit, Ms. Arison has seen water dripping from the ceiling near exposed electrical wires. Indeed, Ms. Arison routinely sees exposed wires throughout the Prison.

*Hazardous Building Infrastructure*

103.     Nearly 130 years old, the Prison's structural integrity has been significantly compromised, even beyond the crumbling sanitation system.

104.     One does not need to venture inside to see the structural deficiencies. The Prison's main yard area is prone to sink holes; once, a sinkhole even swallowed a parked vehicle.

105.     Stress fractures can also be clearly seen in the Prison's walls. Portions of the Prison appear to be sinking into the ground, as evidenced by a basement wall that has shifted to such a degree that certain doors will no longer open.

106.     Asbestos and lead paint are prevalent throughout the Prison, posing significant health risks.

107.     There is exposed wiring throughout the Prison, including in areas prone to flooding.

108.     Moreover, the Prison's isolation cells and medical treatment areas are located in the building's lower level, which lacks an emergency exit. As such, in the event that a fire or other event giving rise to an evacuation occurs on the ground level, the prisoners housed in the lower level areas would be forced to exit through the area where the fire or other emergency is present. Similarly, prisoners on the fourth floor would have to travel two floors down to access an evacuation point.

109.     Where emergency exits do exist, the alert lights are generally in disrepair and out of working order.

*Scarce Outdoor Exercise and Time Out of Cell*

110.     Prisoners have little time out of their cells; indeed, some prisoners have gone weeks or months without being provided any time outdoors to exercise.

999998.02831/109922942v.1

111.    Despite a policy to provide most prisoners two hours of outdoor exercise per day, Plaintiffs and all prisoners suffer from a lack of outdoor time.

112.    Outdoor time is limited for a host of reasons, one of which is concern over a portion of the dilapidated building collapsing.

113.    There have been periods of time where Ms. Arison was not offered outdoor exercise time for weeks.

114.    Similarly, Mr. Ripley has been repeatedly deprived of outdoor exercise time, having only been outside on approximately seven days during the course of a four-month period.

115.    Although the Annex has a separate outdoor exercise area, Mr. Smith has only been outside about five times in the last six months.

116.    Even when outdoor exercise is available, Plaintiffs and other prisoners are offered only the ability to walk around in a circle within a small, chain-linked area.

117.    Prisoners' out-of-cell time is also restricted inside the Prison.  The out-of-cell space on each range is directly in front of the cells.  Because of overcrowding, cots often line a majority of the out-of-cell space. Thus, there is little space for *any* exercise for prisoners.

118.    The only space available in the Prison for any programming such as GED classes or drug and alcohol rehabilitation is the chapel.

119.    The chapel is often unavailable for programming or even religious services, however, as it is used to house prisoners when there are insufficient beds.

### *Overcrowding*

120.    Although the FCP has an authorized capacity of 264 beds, it frequently exceeds that number. As noted above, the current capacity of the Prison was reached by "double-celling" prisoners and building a dormitory-style Annex with an 80-person capacity.

121.    As noted above, FCP officials have publicly stated that the population should not exceed 230 because a higher capacity puts prisoners at risk to their safety and security.

122.    When the Prison reaches capacity, prisoners for whom there are insufficient beds are forced to sleep on the floor in cots (called "boats") in the common area in front of the cells, in the presence of leaking sewage, cockroaches, and rats.

123.    The problems of poor sanitation, medical care, ventilation, heating and cooling, and a lack of meaningful exercise are all compounded by overcrowding.

124.    Overcrowding causes a variety of health and safety problems, and prevents FCP staff from segregating juveniles and individuals suffering from physical or mental illness from the general population.

125.    For example, at times, there was only a single usable shower for thirty people on one range to use during the brief period, from four to seven hours per day, when prisoners are allowed out of their cells in the small common area adjacent to the cells.

126.    Because the prisoners do not have a productive way to expend their time and energy through exercise, an environment of tension, unrest, and violence has permeated the Prison.

### *Insufficient Clothing and Hygiene Items*

127.    When prisoners are booked into the FCP, they are provided with one blanket, one sheet, one towel, and a mattress, many of which are dirty and/or torn.

128.    They are also issued one prison jumpsuit.  Prisoners must purchase any other clothing items, including underwear, bras, and T-shirts from the prison commissary.  If a prisoner is not wearing undergarmets when she is booked into the FCP and has no money to purchase those items from the commissary, FCP will not provide her with undergarments during her incarceration.

999998.02831/109922942v.1

129.    Prisoners are provided with one small bar of soap and five small packets of shampoo per week.  Male prisoners receive one roll of toilet paper per week and female prisoners receive two rolls of toilet paper per week.

130.    Female prisoners are frequently denied menstrual products due to shortages.  Pads are only distributed by a nurse, which creates delays in providing them to prisoners.

131.    When prisoners first arrive at the Prison or move from one cell to another, they must clean their cells and mattresses but are frequently not provided with the necessary cleaning supplies.

### *Lack of Access to Legal Materials and Confidential Attorney Visits*

132.    Prisoners confined in the FCP are represented in their criminal proceedings by public defenders or private defense counsel.

133.    Ms. Arison and Mr. Ripley, like 75% of the prisoners housed at the FCP, are pretrial, and thus need to meet with their attorneys to aid in their defense.

134.    Prisoners, including the Plaintiffs in this action, also consult with other civil attorneys in conjunction with civil rights and other non-criminal matters.

135.    Despite the fact that meetings between attorneys and prisoners are commonplace, the Prison does not have a private meeting area for legal visits, where confidentiality that is supposed to shroud such meetings can be guaranteed.

136.    The primary meeting space for legal visits at the Prison is a holding cell that is situated between the entrance of the Prison and the stairwell to the basement. Because of the cell's location, correctional officers, medical staff, and other prisoners routinely pass *in between* the client and his or her attorney.

999998.02831/109922942v.1

137.    As a result, conversations between prisoners and attorneys are overheard by FCP staff and other prisoners.

138.    Plaintiffs Arison, Dyer, and Ripley have been chilled from speaking candidly with their criminal attorneys due to the lack of privacy in their communications.

139.    In addition to the lack of private space to meet with their attorneys, Plaintiffs are adversely affected by the absence of a law library at the FCP.

140.    Indeed, the FCP fails to provide prisoners in both the Prison and the Annex with access to any legal materials whatsoever.

### *Disparate Treatment of Female Prisoners*

141.    As a matter of custom, practice, or policy, female inmate workers in the Prison are paid less than male inmate workers performing the same or substantially the same jobs.

142.    Female inmate workers are paid $4.50 per week.

143.    Male inmate workers are paid $10.50 per week and receive contact visits.

144.    The only prisoners in the Prison who have contact visits are male inmate workers.

145.    Upon information and belief, the male inmate workers also receive better housing than other prisoners, including the female inmate workers.

### *Planned Efforts to Improve Living Conditions at the Prison Have Repeatedly Failed*

146.    Defendants are fully aware of the need to implement significant remedial measures to eliminate the unsafe and unsanitary conditions described above.

147.    Indeed, Defendant Fayette County's own website catalogues its failed efforts to either improve the conditions at the FCP or build a new correctional facility. *See* http://www.co.fayette.pa.us/prison/Pages/Prison-Construction-Project.aspx?AuthoringError=No UpdatesOnGetRequest (last visited June 7, 2018).

999998.02831/109922942v.1

148.    In 2012, Fayette County began to assess its jail needs.

149.    To that end, a Facility Needs Assessment & Feasibility Study was completed on September 23, 2013, by Crabtree Rohrbaugh & Associates/Sleighter Engineering.

150.    In addition, a 58-acre site was selected at the Dunbar Township Business Park to build a new facility.

151.    That plan was abandoned in 2014.

152.    Defendants thereafter retained Astorino-CannonDesign ("Astorino") to evaluate prior studies, determine the feasibility of renovating the existing Prison, and/or expand the existing Prison to accommodate 400 beds.

153.    Astorino presented a conceptual design on June 23, 2015, but the design was never implemented.

154.    In May 2017, Carter Gobel Associates LLC ("Carter Gobel") completed a new Prison Needs Assessment.  *See* **Exhibit A,** Prison Needs Assessment.

155.    The Prison Needs Assessment identified numerous safety and health hazards at the Prison.

156.    Among other things, the Prison Needs Assessment provides that "[t]he current configuration of receiving prisoners, both inside and outside the building is not only inefficient to proper operations, but dangerous for officers and prisoners." **Exhibit A**, Prison Needs Assessment at 3-3.

157.    It also found that "[t]he existing housing units (ranges) do not offer the proper quantity of beds needed and access to sufficient 'out of cell' space for activities of the inmate population." *Id.* at 3-2.

22

158.    In addition, "Health Services lacks sufficient space to provide basic health care to the inmates.  If operations are to continue in this facility, the space allocated for this function will need to expand."  *Id.*

159.    After conducting its detailed analysis, Carter Gobel found that

> i.    [t]he [P]rison is overcrowded and understaffed.  The design is outdated, inefficient and, in many areas, dangerous to staff and inmates, and there are many maintenance issues in the prison, including plumbing, electrical and HVAC problems. . . .  Previous studies have been conducted for the County Prison with recommendations to completely replace the existing [P]rison with a facility nearly double the current capacity.

*Id.* at 1-1.

160.    Carter Gobel ultimately concluded that the "[P]rison is of such poor design and condition, *it should no longer be used for the housing of inmates.*"  *Id.* at 5-1 (emphasis added).

161.    The conditions at the Prison are so bad that even the United Mine Workers of America ("UMWA")—the union that represents certain corrections officers at the Prison via its Local Union Number 9113—has taken an active role in trying to remedy the problem.

162.    On August 16, 2016, the UMWA filed a complaint with the United States Department of Justice ("DOJ") to request that the Special Litigation Unit of the DOJ conduct an investigation of the unconstitutional conditions at the FCP.  A copy of the UMWA Complaint, without exhibits, is attached hereto as **Exhibit B**.

163.    In sum, Defendants have known for years that the FCP is an inhumane space in which to house prisoners.

164.    Nevertheless, the conditions at the FCP described above persist, thereby necessitating this Court's intervention to enjoin Defendants from continuing to violate Plaintiffs' constitutional rights.

999998.02831/109922942v.1

**Class Action Allegations**

165.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) on their own behalf and on behalf of a class of others similarly situated.

166.    Plaintiffs seek to represent the following class on claims for declaratory and injunctive relief:

**The Class**

> **All individuals who are currently or in the future will be incarcerated at the Fayette County Prison.**

167.    The requirements of Rules 23(a) and 23(b)(2) are all satisfied by this class action.

168.    The information as to the size of the class and the identity of the individuals who are in the class are in the exclusive control of Defendants.  The number of persons who are members of the class described above are so numerous that joinder of all members in one action is impractical.  Although the precise size of the class at any one time is not known, the number of prisoners incarcerated at the FCP routinely exceeds the 264 available beds.

169.    Questions of law or fact are common to the entire class because the actions of Defendants complained of herein are generally applicable to the entire class.  These legal and factual questions include but are not limited to:

    a.    the nature, scope, and operation of Defendants' practices and policies as applied to prisoners incarcerated at the FCP;

    b.    the nature and type of injury caused by Defendants;

    c.    the nature and type of relief appropriate for the class; and

    d.    whether Defendants have acted unreasonably or with deliberate indifference by subjecting the prisoners to the conditions described within this Complaint, and whether those practices violate the First, Eighth, and Fourteenth Amendments to the United States Constitution.

999998.02831/109922942v.1

170.    Plaintiffs' claims are typical of the members of the class because Plaintiffs and all class members are injured by the same wrongful acts, omissions, polices, and practices of Defendants as described in this Complaint.  Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the class members, and are based on the same legal theories.

171.    The representative Plaintiffs will fairly and adequately assert and protect the interests of the class.  There are no conflicts between the representative Plaintiffs and the class as a whole.

172.    The representative Plaintiffs have retained counsel with substantial experience in the conduct of class actions, including actions raising constitutional violations under 42 U.S.C. § 1983.

173.    Defendants have acted and refused to act on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the class as a whole and making certification of the class under Rule 23(b)(2) proper.

174.    Plaintiff Miranda Arison also brings this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) on her own behalf and on behalf of a class of others similarly situated.

175.    Plaintiff Arison seeks to represent the following class on claims for declaratory and injunctive relief:

**The Subclass**

> **All women who are currently or in the future will be incarcerated at the Fayette County Prison.**

176.    The requirements of Rules 23(a) and 23(b)(2) are all satisfied by this class action.

177.    The information as to the size of the subclass and the identity of the individuals who are in the subclass are in the exclusive control of Defendants.  The number of persons who

are members of the subclass described above are so numerous that joinder of all members in one action is impractical.  Although the precise size of the subclass at any one time is not known, the number of women incarcerated at the Prison routinely exceeds the approximate capacity of 44 beds.

178.    Questions of law or fact are common to the entire subclass because the actions of Defendants complained of herein are generally applicable to the entire subclass.  These legal and factual questions include but are not limited to:

e.    the nature, scope, and operation of Defendants' practices and policies as applied to female prisoners incarcerated at the FCP;

f.    the nature and type of injury caused by Defendants;

g.    the nature and type of relief appropriate for the subclass; and

h.    whether Defendants' practices violate the Equal Protection rights of female prisoners  under the Fourteenth Amendment to the United States Constitution.

179.    As noted above, female inmate workers are paid less and denied benefits available to male inmate workers even though they do the same or substantially the same jobs.

180.    Plaintiff Arison's claims are typical of the members of the subclass because Plaintiff and all subclass members are injured by the same wrongful acts, omissions, polices, and practices of Defendant as described in this Complaint.  Plaintiff Arison's claims arise from the same practices and courses of conduct that give rise to the claims of the subclass members, and are based on the same legal theories.

181.    Plaintiff Arison will fairly and adequately assert and protect the interests of the subclass.  There are no conflicts between the Plaintiff Arison and the subclass as a whole.

182.    Plaintiff Arison has retained counsel with substantial experience in the conduct of class actions, including actions raising constitutional violations under 42 U.S.C. § 1983.

183.     Defendants have acted and refused to act on grounds generally applicable to the subclass, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the subclass as a whole and making certification of the class under Rule 23(b)(2) proper.

## Causes of Action

### Count I - Unconstitutional Conditions of Confinement
### in Violation of the Eighth Amendment

184.     Plaintiffs hereby incorporate by reference the allegations contained in the above paragraphs of this Complaint as if fully set forth herein.

185.     Pursuant to the Eighth Amendment to the United States Constitution, Plaintiffs have a right to be free from cruel and unusual punishment.

186.     Defendants have violated Plaintiffs' rights under the Eighth Amendment by acting with deliberate indifference to Plaintiffs' health and safety by failing to correct the conditions described herein, and thereby creating a substantial risk of serious harm.

### Count II - Unconstitutional Conditions of Confinement
### in Violation of the Fourteenth Amendment

187.     Plaintiffs hereby incorporate by reference the allegations contained in the above paragraphs of this Complaint as if fully set forth herein.

188.     Defendants have acted with objective unreasonableness to Plaintiffs' health and safety by failing to correct the conditions described herein, thereby violating the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which entitles a pre-trial detainee to a minimum of no less protection than a sentenced prisoner is entitled to under the Eighth Amendment.

999998.02831/109922942v.1

### Count III -  Failure to Provide Prisoners with a Confidential Meeting Area
### in Violation of the First and Fourteenth Amendments

189.    Plaintiffs hereby incorporate by reference the allegations contained in the above paragraphs of this Complaint as if fully set forth herein.

190.    Defendants have violated Plaintiffs' right to free speech under the First Amendment to the United States Constitution and their right to privacy under the Fourteenth Amendment to the United States Constitution by failing to provide a space where prisoners can have confidential communications with their attorneys.

### Count IV – Discriminatory Treatment of Female Prisoners
### in Violation of the Fourteenth Amendment

191.    Plaintiffs hereby incorporate by reference the allegations contained in the above paragraphs of this Complaint as if fully set forth herein.

192.    Defendants have violated the rights of Plaintiff Arison and other female subclass members under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by compensating female inmate workers less than male inmate workers.

### PRAYER FOR RELIEF

193.    Plaintiffs and the class they seek to represent have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint. Plaintiffs and the class they seek to represent have suffered and will continue to suffer irreparable harm as a result of the unlawful acts, omissions, policies, and practices of Defendants, as alleged herein, unless this Court grants the relief requested. The need for relief is critical because the rights at issue are paramount under the United States Constitution and the laws of the United States.

194.    WHEREFORE, Plaintiffs request that the Court grant the following relief:

a.  Declare that the suit is maintainable as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2);

b.  Declare that the acts, omissions, polices, and practices of Defendants, and their agents, employees, officials, and all persons have violated and continue to violate Plaintiffs' rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution;

c.  Issue an injunction that compels Defendants to eliminate the unconstitutional customs, policies, practices, and conditions challenged in this lawsuit;

d.  Grant attorneys' fees and costs; and,

e.  Grant such other relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Kevin M. Eddy*
Kevin M. Eddy
Pa. ID No. 92904
Blank Rome LLP
501 Grant Street, Suite 850
Pittsburgh, PA  15219
(412) 932-2757
(412) 932-2777 – facsimile
keddy@blankrome.com

*and*

*/s/ Sara J. Rose*
Sara J. Rose
Pa. ID No. 204936

*/s/ Witold J. Walczak*
Witold J. Walczak
Pa. ID No. 62976

*/s/ Dylan Cowart*
Dylan Cowart
Pa. ID No. 324711

AMERICAN CIVIL LIBERTIES UNION

29

OF PENNSYLVANIA
P.O. Box 23058
Pittsburgh, PA 15222
(412) 681-7864
srose@aclupa.org
vwalczak@aclupa.org
dcowart@aclupa.org

*and*

*/s/ Alexandra Morgan-Kurtz*
Alexandra Morgan-Kurtz
Pa. ID No. 312631
PA INSTITUTIONAL LAW PROJECT
100 Fifth Ave, Ste 900
Pittsburgh, Pa 15219
T: (412) 434-6175
Dated:  June 26, 2018          amorgan-kurtz@pailp.org

999998.02831/109922942v.1